O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL HENDERSON, an individual, <br><br> Plaintiff, <br><br> v. <br><br> MATTHEW LINDLAND, an individual; TEAM QUEST FIGHT CLUB, LLC, an Oregon limited liability company, <br><br> Defendants. | Case No. CV 11-01350 DDP (DTBx) <br><br> **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** <br><br> [Docket No. 58] |

Presently before the court is Plaintiff Daniel Henderson's Motion for Summary Judgment, or in the Alternative, for an Order Treating Specified Facts as Established ("Motion"). Having reviewed the parties' moving papers and heard oral argument, the court DENIES the Motion without prejudice and adopts the following Order.

**I. BACKGROUND**

The following facts are not genuinely in dispute for purposes of this Motion. Plaintiff Daniel Henderson ("Henderson") and Defendant Matthew Lindland ("Lindland") are both mixed martial arts

("MMA") fighters. In approximately 1999, Henderson and his MMA teammate, Randy Couture, conceived of the Team Quest Fight Club ("TQFC") name and commissioned an artist to design the TQFC logo (collectively, "TQFC trademarks"). Shortly after, Henderson and Couture began using the TQFC trademarks in connection with MMA entertainment and apparel.

The parties agree that Henderson first used the TQFC trademarks in a number of MMA tournaments in Japan. Although Defendants disagree, Henderson has also provided evidence that he thereby used the TQFC trademarks in commerce. The evidence suggests that Henderson and his corner coaches wore matching clothing that prominently displayed the trademarks immediately before and after Henderson's MMA fights - i.e. during his provision of "MMA entertainment" services. (Mot. at 5.) Further, Henderson has submitted evidence that since at least 2000, the tournaments were recorded, photographed, and written about as entertainment for consumers in the United States. This evidence consists primarily of still frames from tournament videos and archived snapshots of Internet websites using the "Wayback Machine."[1]

Specifically, still frames from video of the 1999 and 2000 "Rings-King of Kings" tournament show Henderson as an MMA fighter, along with Couture and others working as his corner coaches, wearing matching shirts with the TQFC logo and the words "Ringmasters Athletic Club." An archived snapshot of the Full Contact Fighter ("FCF") website from 2000 displays a photograph of

---

[1] The Wayback Machine is a service of nonprofit organization Internet Archive that provides access to archived versions of websites.

2

Henderson and states that Henderson won the 2000 Rings-King of Kings tournament final. It also states that "[f]ull coverage of the event will be in the upcoming issue of FCF," which customers can order by phone, mail, or online. Another snapshot of the FCF website from 2000 shows photographs of Henderson during the Rings-King of Kings tournament fights, as well as Henderson wearing the shirt with the TQFC logo while receiving a $200,000 check for his victory. The website also states: "More on the mega tournament in the upcoming issue of [FCF]." (Henderson Decl. in Supp. of Mot. ("Henderson Decl.") ¶¶ 2-8, Exs. A-E.)

Similarly, still frames from video of the 2000 "Pride 12: Cold Fury" tournament show Henderson's corner coaches wearing matching shirts and hats with the TQFC logo. The shirts also have the words "Team Quest Combat Club." Additional still frames from video of an interview before and video during the March 2001 "Pride 13: Collision Course" tournament show Henderson and a corner coach wearing the same matching TQFC shirt and hats. Snapshots from 2000 and 2001 of two other MMA websites - Sherdog and the Official Pride Fighting Championship Tournament Website - provide pay-per-view ("PPV") schedules for the Pride 12 tournament, including premier and replay showings in North America on DirectTV, Bell Express VU, and Dish Network. (Id. ¶¶ 9-16, Exs. F-M.)

In a separate Declaration, MMA "play-by-play" commentator Stephen Quadros confirms that he provided commentary for several Henderson fights, including the Pride 12 tournament. According to Quadros, his "commentary was spoken in English and intended for English speaking consumers including pay-per-view broadcast . . . and DVD sales in the United States." Quadros also states that he

3

1  "was aware that [Henderson] was associated with the [MMA] team
2  named TEAM QUEST." (Quadros Decl. in Supp. of Mot. ¶¶ 2-6.)
3      Other website snapshots from April 2001 to the present provide
4  similar evidence, as well as: 1) evidence from 2002 of Henderson's
5  online website, with the TQFC logo next to a link for "Store"; and
6  2) evidence from 2003 of a PlayStation 2 "Pride Fight Championship"
7  video game that includes an animated version of Henderson and his
8  corner coaches wearing the TQFC shirts and hats. (Henderson Decl.
9  ¶¶ 17-41, Exs. N-KK.)
10     Starting in 2001, however, Defendant Lindland also began using
11 the TQFC trademarks. Lindland had previously become associated
12 with Henderson and Couture through their shared MMA activities. In
13 April 2001, Lindland used the TQFC "name in connection with a
14 wrestling program for kids that was registered in Oregon." Since
15 then, Lindland has used the TQFC trademarks "in connection with
16 wrestling and MMA instruction, fitness and related merchandising
17 and licensing." Lindland and Couture also founded Defendant TQFC
18 LLC, an MMA gym, in October 2002. In May 2005 and December 2008,
19 TQFC LLC filed for and received federal trademark registrations
20 using the TQFC logo and name. (Opp'n at 3-4, 12-14.)
21     According to the parties, Henderson, Lindland, and Couture
22 worked cooperatively from approximately 2001 to 2011. Defendants
23 claim, for instance, that Henderson operated a TQFC gym with their
24 support. Defendants also claim that they covered legal and
25 administrative expenses associated with protecting and sublicensing
26 the TQFC trademarks, at Henderson's request. Henderson describes
27 the events differently, but agrees that the parties worked
28 cooperatively during this period. (Opp'n at 14; Reply at 3.)

The relationships soured, however, around 2011.  Henderson contends that Lindland demanded reimbursement for legal fees associated with the trademarks.  Defendants claim that they terminated Henderson's trademark license after he "took steps to undermine it."  In any event, Defendants sent Henderson a cease and desist letter in January 2011, leading Henderson to file this infringement action in February 2011.  (Opp'n at 1; Mot. at 1.)

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law."  Id. at 248.  No genuine issue of fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

It is not enough for a party opposing summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson,

5

477 U.S. at 259. Instead, the nonmoving party must go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 325. The "mere existence of a scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary judgment. <u>Anderson</u>, 477 U.S. at 252.

**III. Discussion**

In his Motion, Henderson requests summary adjudication that he was the senior and prior user of the TQFC trademarks. Defendants set forth a number of procedural reasons to deny the Motion: 1) Henderson filed the motion a day late; 2) Henderson failed to produce his evidence in discovery and is producing it now for the first time; and 3) Henderson's evidence is not properly authenticated and is inadmissible. Substantively, Defendants also argue that Henderson is not a senior user, because: 1) Henderson merely displayed the trademarks, he did not use them in commerce; 2) even if Henderson did use them in commerce, he did so in Japan, not in the United States; and 3) even if Henderson was a prior user, so was Couture, and Couture transferred all of his rights to Defendant TQFC LLC. Finally, Defendants argue that they are entitled to laches in any event, because Henderson has waited more than a decade to assert his rights.

The court rejects Defendants' first two procedural arguments, but agrees that much of Henderson's evidence is not properly authenticated. As a result, Henderson has not carried his burden and his motion for summary judgment must be denied, without prejudice to his refiling with properly authenticated evidence. Nonetheless, the court notes that if this evidence were properly

6

before the court, it would appear that Henderson was in fact a senior user of the TQFC trademarks. However, the court also questions the continued viability of all of the parties' claims, as it appears that the parties have viable laches defenses as to each other.

### A. Procedural Issues

#### 1. Late Filing and Production of Evidence

The court expects strict compliance with all federal and local rules, but finds that Henderson's violation of the Scheduling Order here was de minimis. Henderson filed his Motion less than a day late. The court therefore declines to deny the Motion on this ground. Similarly, there is no evidence that Henderson withheld relevant documents in response to Defendants' prior discovery requests. To the contrary, Henderson claims that he only discovered this evidence after responding to Defendants' requests. Henderson also explains that the evidence consists primarily of MMA videos and archived Internet content that were equally available to Defendants. Nor have Defendants alleged that any delay has caused them prejudice, or that they need additional time to respond to the Motion as a result. The court therefore declines to deny the Motion on this ground as well.

#### 2. Admissibility of Evidence

The court, however, agrees with Defendants that Henderson has failed to properly authenticate the snapshots of archived Internet websites. Henderson attaches the snapshots as exhibits to his own Declaration, stating only that he used the Wayback Machine to obtain them. This is insufficient to authenticate the snapshots as accurately reflecting the archived content of the relevant

7

websites. See, e.g., Sam's Riverside, Inc. v. Intercon Solutions, Inc., 790 F. Supp. 2d 965, 980-81 (S.D. Iowa 2011) (discussing this issue in more detail and reaching the same conclusion on similar facts).

Discounting this evidence, the court finds that Henderson is not entitled to summary judgment as to prior use. The tournament videos and Quadros Declaration alone are not enough to establish that Henderson used the TQFC trademarks in commerce in the United States. However, Henderson may refile for summary judgment with properly authenticated evidence. See id. at 981 ("[C]ourts have concluded that an affidavit from an Internet Archive employee is sufficient to authenticate screen shots taken from Archive.org.").

**B. Substantive Issues**

Although Henderson has failed to submit sufficient admissible evidence to support his Motion, the court still finds it appropriate to address the substantive issues fully briefed and argued by the parties. Again, Defendants contend that even if Henderson's evidence were admissible: 1) Henderson has not shown that he used the TQFC trademarks in commerce, or in commerce within the United States; 2) even if he did, Defendant TQFC LLC is a co-senior user, because Couture transferred all of his interests to TQFC LLC; and 3) Henderson's trademark claims are barred by laches. The court finds the first two arguments unpersuasive, but agrees that Defendants appear to have a valid laches defense. The court also notes, however, that Henderson appears to have an equally valid laches defense as to Defendants' trademark claims. The court therefore has serious doubts as to the continued viability of the entire action.

**1. Use in Commerce**

There is no genuine dispute here that Henderson first used the TQFC trademarks in Japan, prior to Defendant Lindland's first use of the trademarks in April 2001. See Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use."). Defendants argue, however, that Henderson's use of the trademarks was not enough to constitute "use in commerce," as required to establish ownership rights. The court disagrees.

To establish use in commerce, the alleged prior user must prove: 1) that it used the marks in "in such a manner that sufficiently associated the marks with the . . . provision of . . . services"; and 2) "that its use of the marks was continuous and not interrupted." Dep't of Parks & Recreation v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1125-26 (9th Cir. 2006.)

Looking at the evidence as a whole - including the inadmissible evidence - it appears that Henderson successfully associated the TQFC trademarks with his MMA entertainment services, and did so continuously from 2001 to the present. As discussed, Henderson and his corner coaches wore matching hats and shirts with the TQFC logo and name, before, during, and after MMA fights. Henderson wore the same shirt displaying these trademarks while accepting a $200,000 check for his MMA services. A well-known commentator has stated under oath that he associated Henderson with the TQFC team. And ultimately, a large video game manufacturer created an animated Henderson character wearing the TQFC apparel. Taking all this evidence into consideration, Henderson did more than merely display the TQFC trademarks, he associated them with

his MMA services, such that MMA consumers were aware that Henderson was providing these services as a part of brand TQFC.

### 2. Location of Use

Defendants further argue that even if Henderson used the trademarks in commerce, this does not establish prior use under the law, because the fights took place in Japan. Location of use is critical because "'[p]riority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world.'" Grupo Gigante SA De CV v. Dallo & Co., Inc., 391 F.3d 1088, 1093 (9th Cir. 2004) (quoting  J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 29:2, at 29-6 (4th ed. 2002) ("McCarthy") (internal footnote omitted)) (alteration in original).

Here, however, Henderson has provided evidence that his early use of the TQFC trademarks did in fact occur in the United States. In particular, while the fights themselves physically took place in Japan, live and recorded video of the fights were sold directly to consumers in the United States as PPV broadcasts and DVDs, as well as through magazine coverage. Accordingly, it appears that Henderson's prior commercial use of the TQFC trademarks took place in the United States.

### 3. Couture's Transfer of Rights

Defendants next argue that even if Henderson did use the trademarks in commerce and in the United States, then Defendant TQFC LLC is a co-senior user with Henderson. Henderson himself alleges that Couture was involved in the initial creation and use of the TQFC trademarks. Thus, Defendants appear to correctly contend that Couture was a co-senior user of the marks.

Defendants further claim that Couture then transferred all of his rights in the trademarks to Defendant TQFC LLC.  The court disagrees.  As Henderson notes, "the document reflecting this transfer makes no mention of trademarks or any intellectual property."  (Reply at 2.)  Specifically, the written "Agreement for Release of Interest in TeamQuest Fight Club LLC," states that: "Couture hereby transfers and surrenders all interest he holds in TeamQuest to TeamQuest."  (Decl. of Robert Follis in Supp. of Defs.' Mot. to Dismiss ¶ 9, Ex. F.)  It therefore appears that Henderson was transferring all of his rights in TQFC LLC back to Defendant TQFC LLC, not any preexisting trademark rights.

### C. Laches

Finally, Defendants argue that they are entitled to an affirmative defense of laches.  The Ninth Circuit has "set out six factors for determining whether laches bars a claim for either damages or injunctive relief in an action for trademark infringement."  Grupo Gigante, 391 F.3d at 1101-1102.  These factors include:

1. strength and value of trademark rights asserted;
2. plaintiff's diligence in enforcing mark;
3. harm to senior user if relief denied;
4. good faith ignorance by junior user;
5. competition between senior and junior users; and
6. extent of harm suffered by junior user because of senior user's delay.

Id. at 1102; see also 3A Fed. Jury Prac. & Instr. ch. 159 (5th ed.) ("Laches exists when the plaintiff knows of the defendant's infringing use, delays in taking any action against that use, and

11

1  knows the defendant is prejudiced as a result of the delay."); <u>MDT</u>
2  <u>Corp. v. N.Y. Stock Exch., Inc.</u>, 858 F. Supp. 1028, 1033 (C.D. Cal.
3  1994) ("Laches is a question of law and may be determined on
4  summary judgment." (citing <u>Am. Int'l Group v. Am. Int'l Bank</u>, 926
5  F.2d 829, 831 (9th Cir. 1991))).
6       Considering these factors, it appears that Defendants are
7  indeed entitled to a laches defense.  It also appears, however,
8  that Henderson has the same laches defense as to Defendants.  In
9  particular, although the parties have not addressed the first
10 factor, the "Team Quest Fight Club" name and clenched fist logo
11 seem to be at least moderately strong marks.  Next, the diligence
12 factor weighs strongly in favor of laches as to all of the parties.
13 Henderson has waited more than ten years to take any action against
14 Defendants, while apparently acquiescing to Defendants'
15 registration of the trademarks in the interim.  Likewise, not only
16 does it appear that Defendants were aware of Henderson's creation
17 and continuing use of the marks, but Defendants themselves allege
18 that they helped Henderson to use the marks through a TQFC gym.
19 Thus, because Defendants did not send a cease and desist letter to
20 Henderson until 2011, Defendants also waited nearly a decade to try
21 to enforce any trademark rights.
22      The "harm to senior user if relief is denied" and "good faith
23 ignorance by junior user" factors also weigh in favor of laches
24 against both sides.  The parties were apparently sharing use of the
25 trademarks peacefully until 2011.  Thus, there is no reason to
26 think that either side was using the marks in bad faith, or was
27 particularly concerned about the other side harming the value of
28 the marks.  Further, although there is no evidence as to current

competition between the parties, it appears that any junior user would suffer significant harm as a result of the senior user's delay in enforcing the trademark rights.  Each side has now spent approximately ten years developing and providing products and services using the trademarks.

Last, as one treatise has noted, courts have been particularly likely to find laches where there is some "plus factor" in support of its application.  Relevant here, one such factor is: "Business dealings between the parties amounting to implied consent to use." McCarthy § 31:7.  Again, the parties seem to agree that, until recently, they were working together to commercially exploit the trademarks.

In sum, and looking at the bigger picture, both sides appear to have certain ownership rights in the trademarks and to have acquiesced to each other's use.  The court therefore does not see an equitable basis for any of the parties, after having shared use for more than a decade, to now seek to exclude the others.  Indeed, a principal purpose of trademark law is to protect the public, which - at this point - likely associates the TQFC trademarks with all of the parties involved.  The court also notes that if, as it appears, laches applies on all sides, and the parties are unable to reach an agreement for moving forward, then they each run the risk of one another causing damage to the trademarks in the future, with no recourse to the courts.

///
///
///
///

**IV. CONCLUSION**

For all of these reasons, the court hereby DENIES without prejudice Plaintiff's Motion for Summary Judgment.

IT IS SO ORDERED.

Dated: August 15, 2012

DEAN D. PREGERSON
United States District Judge

14